and 28th, Mr. Carrard drew four checks in amounts of $200, $270, $425, and $300, and each of them was indorsed by Mr. Schultz and paid by the bank on the date of the depositor's order. It being shown that the decedent was amply able to pay his debts, the law presumes that he discharged his duty, and this presumption will not be overborne in a case like this without clear and convincing proof on the part of the claimant. Nor will the presumption that moneys paid to the proprietor of the house or her husband by the decedent were in discharge of his obligations be overcome by the statement of either husband or wife that the proceeds of checks which passed through their hands went to Mr. Carrard, especially in view of the fact that the bank upon which the checks were drawn was only one block away from the Schultz Hotel, and there is no apparent reason why the drawer should not have gone in person to his place of deposit had he wanted the funds himself. Moreover, in this case, while Mr. Schultz swears that he never had any business connection whatever with Mr. Carrard, and does not disclose the nature of any outside business he was engaged in at any time during this accumulation of items against the decedent, he nevertheless pretends that he often advanced sums of money ranging to $500 to Mr. Carrard for mere accommodation, without any profit to himself, and he boasted of the fact in his testimony that he was in the habit of lending other persons as much as $1,000 on their mere parol, because, as he stated it, he was a reckless man. It appears that Mrs. Schultz gave her checks to Mr. Carrard at various times in amounts aggregating $883.33, but, as this amount is exceeded by checks given to her or her husband, who was her agent, by $3,671.02, without making any allowance for interest, and there is no credible testimony in the case explaining the difference, it is clear that the claim is not established, even if it be conceded, as it is not, that the items in the alleged account, as filed, are all correct. There was some evidence offered by the claimant to show that Mr. Carrard was from time to time embarrassed for ready money, and the attorney pressing the claim offered himself as a witness to prove this fact. While for twenty-five years he was a legal adviser of Mr. Carrard, he was also his intimate personal friend. His testimony was excluded, but its offer, under the circumstances, tended strongly to show the inherent weakness of the case on that point. The burden of proof which the law imposes on a party presenting a claim against a decedent's estate has not in this instance been sustained, and there is no satisfactory evidence before me that Mr. Carrard was at the time of his death indebted to Mrs. Schultz in any amount. I therefore conclude that the claim should be disallowed, with costs and disbursements to the defendants.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

H. M. Gescheidt, for appellant.

Frank Moss and Isidor Wels, for respondent.

PER CURIAM. Judgment affirmed, with costs.

---

MULHERN v. CARRARD.

(Supreme Court, Appellate Division, First Department. April 7, 1905.)

1. ADMINISTRATORS—CLAIMS—EVIDENCE—SUFFICIENCY.

The unsupported testimony of a claimant is insufficient to establish against an estate a claim for personal services rendered to the decedent during his lifetime.

[Ed. Note.—For cases in point, see vol. 22, Cent. Dig. Executors and Administrators, § 903½.]

2. SAME—EVIDENCE—SUFFICIENCY.

Evidence *held* insufficient to establish against an estate a claim for personal services consisting of taking care of premises and nursing and attending the decedent during his lifetime.

Appeal from Judgment on Report of Referee.

Action by Johanna Mulhern against Lydia Carrard, as administratrix, and Jules Chatelan, administrator, of Frederick Carrard, deceased. From a judgment for defendant, plaintiff appeals. Affirmed.

The following is the opinion of the referee:

This is a claim for $909.93, inclusive of interest to April 22, 1904. It is based upon work, labor, and services alleged to have been rendered for Frederick Carrard, now deceased, during several periods of time intervening the 1st day of August, 1898, and the 26th day of August, 1902. Mr. Carrard was the owner of the premises 1746 Madison avenue, and the adjoining house in 115th street, New York City, and the claimant was the janitress of said premises. The first item of her charge is for looking after the flat in which Mr. Carrard lived from August 1, 1898, to August 1, 1901, at $10 per month. The second item is for attendance, nursing, supplying nutriment, and looking after the flat for 30 weeks between the dates of August 1, 1901, and August 26, 1902, at fifteen dollars ($15) per week.

The first question, therefore, is whether the services were rendered as alleged, and to the determination of that we must look to the testimony of some disinterested witness in support of the claimant herself. She, of course, testified, that she rendered services as stated, but her unsupported testimony would not be sufficient in a case of this sort. Now, the main supporting witness is the husband of Mrs. Mulhern; and it appears that he was a printer, but had not done much since the invention of typesetting machinery, and had lived in the premises for several years prior to the death of Mr. Carrard, in 1902. The compensation for janitor services had always been $20 a month, and, so far as appears in the testimony, this was his sole source of income. This witness testified that his wife rendered the services stated, but it is not clear that he is a disinterested party because he frequently refers to the compensation which was alleged to have been agreed upon as coming from Mr. Carrard to "us" (meaning himself and wife), and said, with reference to an alleged agreement made with Mr. Carrard by him, that he was willing to take anything in the shape of money for his wife's services. Again, when the witness was asked by his wife's attorney: "Q. What would be the fair value per month for taking care of those five rooms?" he said "A. Just to clean them and keep them in order? Q. Yes. A. Fifty dollars. Q. You got $10 a month? A. Yes; but I would consider it worth $50." So that the testimony of this witness, in the light of these discrepancies and others that could be readily pointed out, is not to be taken too seriously. There were some other witnesses offered, who swore that they saw Mrs. Mulhern from time to time in Mr. Carrard's flat, carrying food therein, or doing labor in and about the care thereof, such as she claims to have done; but not one of these witnesses was in position to know or pretended to say that Mrs. Mulhern was in the apartment rendering services continuously from day to day, during the period covered by her claim; and, while she herself admits that Mr. Carrard was sometimes absent from his apartment during the period for which she claimed $15 per week for nursing and otherwise looking after him, she says that she did not keep any memorandum of his absences—only kept her account in her head. And thus the case stands substantially on behalf of the claimant.

Now it appears on behalf of the estate that during all the time of the alleged rendition of these services Mr. Carrard was a man of considerable means, of close and regular habits, partly caring for himself, possessing ample funds, and in every way able to discharge any and all the obligations which he was under to Mrs. Mulhern. The fact that the Mulherns were people without means and of small income, dependent upon their labor for their living, would seem to require some clear explanation on their part for waiting thirty-six (36) months to collect from the owner of the premises in which they lived compensation at the rate of $10 a month said to be due them for the care of his apartment. No such explanation is given in this case. On the other hand, it appears that the services of janitor were paid to the time of Mr. Carrard's death, and the excuse which is alleged to have been assigned by

Mr. Carrard himself for not paying his obligations, to wit, that he was in law-suits and had lost heavily in stocks, is not borne out by the evidence in the case. It is shown beyond question that Mr. Carrard was at all times able to meet just demands made upon him, and also that he was in the habit of having ample funds upon his person; and it is not to be presumed, under such circumstances, that he would neglect his duty to pay a domestic for looking after his apartment, if he hired one for that purpose, for a period of thirty-six (36) months. The best that can be made of the case on this branch is that Mrs. Mulhern's services were occasional, not regular, and were paid for as rendered.

With regard to the claim for nursing, supplying nutriment, etc., for 30 weeks from August 1, 1901, to August 26, 1902, it is sufficient to say that the evidence here shows that Mr. Carrard was not in condition to require any such services during that time. On the contrary, it appears from the testimony of his friends of long standing and his brokers, whose office he was in the habit of visiting regularly, that, while he was in failing health for a year prior to his death, it was only during the last two or three weeks of his life that he was in such physical condition as to require the constant help and assistance of a nurse or attendant. During these last few weeks Mrs. Schwenck, who had known Mr. Carrard for many years, was called upon in natural order to give the assistance; Mr. Carrard being a man of no family, and his nephew having married her daughter. Mr. Carrard's nephew and wife, Mrs. Schwenck's daughter, also helped to care for him during this critical period, to give him such aid as he required in the last days of his existence. Mrs. Schwenck testified that she offered to compensate Mrs. Mulhern for such services as she rendered during these last days, and she was met with the response, "Why I would do anything for Mr. Carrard, if I could; he was such a good man always to me."

The burden of proof as to the rendition of the services not having been sufficiently borne out by the claimant, it is unnecessary in strictness to dwell upon the question of the alleged agreement with Mr. Carrard for compensation for such services. Mr. Mulhern is the sole reliance on this point. Bearing in mind that this witness on direct examination gave the figure as $15 per month for nursing and supplying nutriment, and charitably assuming that this was a lapse of memory or verbal inaccuracy on his part, yet it appears on cross-examination that he was not clear as to times and amounts, and it was only a supposition on his part that his wife earned the money with which she bought food as alleged for Mr. Carrard. He did not know where she got it. Certainly his testimony is not sufficient to fasten a contract upon the estate of a deceased person, especially in view of the fact that no such contract was necessary or even excused by the circumstances then existing.

It is clear in the whole case that the claim has not been established as required by law, and that it should be disallowed, with costs and disbursements to the defendants.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

H. M. Gescheidt, for appellant.

Frank Moss and Isidor Wels, for respondent.

PER CURIAM. Judgment affirmed, with costs.

---

GREEN v. URBAN CONTRACTING & HEATING CO. et al.

(Supreme Court, Appellate Division, First Department.  July 7, 1905.)

NEGLIGENCE—ELEVATORS—EVIDENCE—CONTRIBUTORY NEGLIGENCE.

Where the machinery of an elevator was in perfect order, and a tenant of the building, on coming to work in the morning, found the elevator standing at a floor, with the door open, and, while waiting for the operator of the elevator to arrive, he stood partly on the elevator and partly on the